**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case No.: 12-62058-CIV-DIMITROULEAS**

| | |
|---|---|
| **MARK KRZYKWA,** as an individual, and on behalf of all others similarly situated, | : |
| | : |
| | : |
| *Plaintiff,* | : |
| | : |
| *vs.* | : |
| | : |
| **CAMPBELL SOUP CO.** a New Jersey corporation, | : |
| | : |
| | : |
| *Defendant.* | : |
| | : |

_____

<u>**SECOND AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiff MARK KRZYKWA, individually and on behalf of all others similarly situated, by and through his attorney, and pursuant to *Federal Rule of Civil Procedure* 15(a)(2), hereby brings this consumer class action against Campbell Soup Co., a New Jersey Corporation ("Defendant" or "Campbell"), to challenge Defendant's violations of Florida state law based on their unlawful, deceptive, and fraudulent business practices, whereby Plaintiff seeks certification of this matter as a class action, by submitting this Second Amended Class Action Complaint, and alleging as follows:

**I. <u>INTRODUCTION</u>**

1.      Defendants have represented that its products are "ALL NATURAL," when in fact, they are not, because they contain genetically modified corn, which is a bio-engineered food, most commonly known as a genetically modified organism ("GMOs").

2.      Campbell Soup Company is a global manufacturer and marketer of convenience food products worldwide with over 17,000 full-time employees. Defendant has a portfolio of brands, including the "Campbell's" brand of soups. Defendant markets, advertises, sells and distributes these products to Florida purchasers in food chains, mass discounters, mass merchandisers, club stores, convenience stores, drug stores and dollar stores.

3.      At issue here is Campbell's 100% Natural Soups line of soups.  Defendant markets these as "100% Natural," when in fact, some flavors are not, because they contain Genetically Modified Organisms ("GMOs") in its corn ingredients. The misleading claims appear on the labels of the following flavors that all contain GMO corn: Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup (collectively, the "Products").  In addition, Defendant advertises the Products as being 100% Natural in advertising not related to the labeling of the Products, including online and in print advertisements.

4.      Although Defendants market the Products as "ALL NATURAL," these claims are false because the Products contain GMOs, plants whose genetic makeup has been altered through biotechnology to exhibit characteristics that would not otherwise occur in nature.[1] Genetic engineering is different from natural/conventional plant breeding and poses distinct risks.

---

1.      Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; Pg. 4.

5.      Specifically, the genetic engineering and associated tissue culture processes are highly mutagenic, leading to unpredictable changes in the DNA and proteins of the resulting GMO that can lead to unexpected toxic or allergenic effects. [2]

6.      Accordingly, Plaintiff has brought this class action for injunctive relief, restitution, disgorgement, and damages against Campbell for false and misleading advertising in violation the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. §§ 501.201, *et seq.* ("FDUTPA"), and for Unjust Enrichment.  Plaintiff's state law claims mirror the labeling, packaging, and advertising requirements mandated by federal regulations and laws, as more fully described below.

7.      Plaintiff seeks an Order prohibiting Campbell's from including genetically modified corn in its "100% Natural Soup" products or, in the alternative, from representing the Products are "100% Natural" when they are not, because bio-engineered corn is not 100% Natural.

## II. JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter presented by this Second Amended Class Action Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

---

2.   Michael Antoniou, Claire Robinson, and John Fagan. *GMO MYTHS AND TRUTHS: AN EVIDENCE-BASED EXAMINATION OF THE CLAIMS MADE FOR THE SAFETY AND EFFICACY OF GENETICALLY MODIFIED CROPS.* Earth Open Source, at 21. (June 2012).

9.      Plaintiff alleges that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2).

10.      As set forth below, Plaintiff is a citizen of Florida, and Defendant Campbell Soup Co. can be considered a citizen of New Jersey. Therefore, diversity of citizenship exists under CAFA, as required by 28 U.S.C. § 1332(d)(2)(A).

11.      Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(a) because, a substantial part of the events and misrepresentations giving rise to Plaintiff's claims occurred in this District, Defendant conducts business in, and may be found in, this district, and Plaintiff purchased the subject Products of this action in, and resides in, this judicial district.

## III. PARTIES

12.      Plaintiff is an individual over 18 years old, and at all times relevant hereto, was an individual residing in Fort Lauderdale, Broward County, Florida. Plaintiff respectfully requests a jury trial on any and all damage claims.

13.      Defendant Campbell Soup Co. ("CAMPBELL") is a corporation organized and existing under the laws of the state of New Jersey.  CAMPBELL maintains a principal place of business at 1 Campbell Place, Camden, New Jersey 08103-1799. Directly and through its retailers, distributors, and agents, CAMPBELL has substantial contacts with, and receives benefits and income from and through, the State of Florida.

14.      The labeling and advertising for the Products relied upon by Plaintiff was prepared and/or approved by CAMPBELL and its agents, and was disseminated by CAMPBELL and its agents through labeling and advertising containing the misrepresentations alleged herein. The labeling and advertising for the Products was designed to encourage

consumers to purchase the Products and reasonably misled the reasonable consumer, including Plaintiff and the Class.

15.    CAMPBELL is the owner, manufacturer and distributor of the Products, and is the company that created and/or authorized the false, misleading and deceptive labeling and advertising for the Products.  Plaintiff alleges that, at all times relevant herein, CAMPBELL and its subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents, servants and employees of CAMPBELL, and at all times relevant herein, each was acting within the purpose and scope of that agency and employment.

16.    Plaintiff further alleges on information and belief that at all times relevant herein, the distributors and retailers who delivered and sold the Products, as well as their respective employees, also were CAMPBELL's agents, servants and employees, and at all times herein, each was acting within the purpose and scope of that agency and employment.

17.    In addition, Plaintiff alleges that, in committing the wrongful acts alleged herein, CAMPBELL, in concert with its subsidiaries, affiliates, and/or other related entities and their respective employees, planned, participated in and furthered a common scheme to induce members of the public to purchase the Products by means of false, misleading, deceptive and fraudulent representations, and that CAMPBELL participated in the making of such representations in that it disseminated those misrepresentations and/or caused them to be disseminated.

18.    Whenever reference in this Second Amended Class Action Complaint is made to any act by CAMPBELL or its subsidiaries, affiliates, distributors, retailers and other related entities, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of CAMPBELL committed, knew of, performed,

authorized, ratified and/or directed that act or transaction on behalf of CAMPBELL while actively engaged in the scope of their duties.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Plaintiff's State Law Claims are Consistent with Federal Regulations

19.     Defendant has uniformly represented and continues to represent that the Products are "100% Natural," prominently displaying this language in large letters on the front of the Products' packaging, and in other advertising such as print and online advertisements stating the Products are 100% Natural.  Contrary to Defendant's representations, however, the Products are not 100% Natural, because they contain bio-engineered corn (GMO corn), which is not natural.

20.     Plaintiff is explicitly alleging only violations of Florida state law that is identical and/or mirrors the labeling, packaging, and advertising requirements mandated by federal regulations and laws, including but not limited to, the Federal Food, Drug, and Cosmetic Act (FD&C Act), the Federal Food and Drug Association (F.D.A.), the Federal Trade Commission (F.T.C.), and the Nutrition Labeling and Education Act (N.L.E.A.).

21.     For example, the Florida Food Safety Act, Fla. Stat. § 500.01, states:

Purpose of chapter.—This chapter is intended to:

(1)   Safeguard the public health and promote the public welfare by protecting the consuming public from injury by product use and the purchasing public from injury by merchandising deceit, flowing from intrastate commerce in food;

(2)   Provide legislation which shall be uniform, as provided in this chapter, and administered so far as practicable in conformity with the provisions of, and regulations issued under the authority of, the Federal Food, Drug, and Cosmetic Act; the Agriculture Marketing Act of 1946; and likewise uniform with the Federal Trade Commission Act, to the extent that it expressly prohibits the false advertisement of food; and

   (3) Promote thereby uniformity of such state and federal laws and their administration and enforcement throughout the United States and in the several states.

Fla. Stat. § 500.02(1)–(3).

22. In addition, in Florida, "A food is deemed to be misbranded:  If its labeling is false or misleading in any particular." Fla. Stat. § 500.11(1)(a).

23. Likewise, the F.D.A. regulation on misbranded foods states, "A food shall be deemed to be misbranded—False or misleading label If its labeling is false or misleading in any particular." 21 U.S.C. § 343.

### Campbell's Uniform Advertising and Labeling of its 100% Natural Soup Products

24. Defendant manufactures, distributes and markets a variety of premade soup products, such as condensed soup, Chunky™, Slow Kettle® Style, Gourmet Bisques, Healthy Request® and Campbell's Go™ Soup.

25. Defendant Campbell Soup Company is one of the latest entrants into the lucrative, multi-billion dollar per year "natural" or "healthy" food market. Since at least 2009, Defendant has manufactured, distributed, and marketed the "Campbell's 100% Natural®" line of soups, including the following flavors that all contain GMO corn: 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup (the "Products"). Defendant markets, advertises, sells and distributes these Products to Florida purchasers in Florida food chains, mass discounters, mass merchandisers, club stores, convenience stores, drug stores and/or dollar stores.

26. Each Product's label states, in large bold letters, that it is "100% Natural." All Consumers who purchase the Products are exposed to the same "100% Natural" claim. Unfortunately for consumers, consumers are charged a premium for these alleged "100%

Natural" products. Defendant's advertising and labeling is misleading and likely to deceive the average customer.

27.     Defendant's "100% Natural" claims are also broadcast over the Internet on its website, www.campbellsoup.com/Products/100Natural.com, making the following statements:

    a)   "100% naturally delicious"

    b)   "100% Natural now has 37 delicious varieties that contain only 100% natural ingredients- like … farm-grown vegetables and flavorful herbs and spices"

28.     Defendant's "100% Natural" representations convey a series of express and implied claims which they know are material to the reasonable consumer and which they intend for consumers to rely upon when choosing to purchase Defendant's products. The advertising and marketing for the Campbell's Soup 100% Natural Soup creates the uniform, false and misleading impression that the Products are comprised of only 100% natural ingredients. Defendant then charges a premium for soup that is not 100% natural, but that contains the same genetically modified ingredients contained in its other soup varieties. There is nothing natural about genetically modified food.

### Genetically Modified Ingredients Are Not "100% Natural"

29.     The terms Bio-engineered foods, bio-tech foods, GM foods, or GMOs (genetically-modified organisms) commonly refer to crop plants created for human or animal consumption using molecular biology and chemistry techniques. The purported purpose of genetic engineering plants is to enhance certain traits, for example, increased resistance to herbicides and pesticides.

30.     One common example is the use of *Bacillus thuringiensis,* (B.t.) genes into corn. B.t. is a naturally occurring bacterium that produces crystal proteins that are lethal to insect

larvae. Using B.t. crystal protein genes in corn enable the corn to produce its own pesticides against insects.  However, this alters the corn, thereby rendering it not natural, and certainly not 100% Natural, and is just one example how the existence of GMOs in the Products makes the "100% Natural" claim blatantly false and misleading.

31.     Genetic engineering is different from natural/conventional plant breeding and poses distinct risks.  Specifically, the genetic engineering and associated tissue culture processes are highly mutagenic, leading to unpredictable changes in the DNA and proteins of the resulting GMO that can lead to unexpected toxic or allergenic effects.[3]

32.     A window into the scientific description of how GMOs are produced refutes any attempt to categorize them as 'minimally processed,' "all-natural" or substantially similar to something naturally occurring. Contemporary research on GMOs has made clear that genetic engineering is completely different from natural breeding and entails different risks because the genetic engineering and associated tissue culture processes are imprecise and highly mutagenic, leading to unpredictable changes in the DNA, proteins, and biochemical composition of the resulting GMO that can lead to unexpected toxic or allergenic effects and nutritional disturbances:

> [T]he process of inserting a genetically modified gene into the DNA of a plant cell is crude, uncontrolled, and imprecise, and causes mutations – heritable changes – in the plant's DNA blueprint. These mutations can alter the functioning of the natural genes of the plant in unpredictable and potentially harmful ways.
>
> Because of these diverse interactions, and because even the simplest organism is extremely complex, it is impossible to predict the impacts of even a single GM gene on the organism. It is even

---

3.     *See supra* note 2, at 21.

more impossible to predict the impact of the GMO on its environment – the complexity of living systems is too great.  In short, unintended, uncontrolled mutations occur during the GM process and complex interactions occur at multiple levels within the organism as a result of the insertion of even a single new gene.  For these reasons, a seemingly simple genetic modification can give rise to many unexpected changes in the resulting crop and the foods produced from it.  The unintended changes could include alterations in the nutritional content of the food, toxic and allergenic effects, poor crop performance, and generation of characteristics that harm the environment.[4]

33.  The Products pose a potential threat to consumers because medical research and scientific studies have yet to determine the long-term health effects of genetically engineered foods.   Recent studies suggest that GMOs may in fact be harmful to a consumer's health.  For example, an insecticidal toxin, known as BT toxin, is often inserted into the genetic code of an array of crops to enable the plant to produce its own insecticide.  This insecticide is released when insects ingest it.[5] Though BT toxin was supposed to be safe for humans (the digestion system in the human body was supposed to destroy it), more recent studies have shown that the human gut is actually not destroying it.[6]  Canadian researchers this year reported that the blood of ninety-three percent (93%) of pregnant women and eighty percent (80%) of their umbilical-

---

4.     *Id.* at 11.

5.     Golberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-sweet-corn.

6.     *Id.*

cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though digestion was supposed to remove it from the body.[7]

### Increased Public Concern Over GMOs

34.     GMOs are not expected to be in foods labeled "100% Natural." Recently, Americans have expressed a heightened concern about the safety of GMO Products, as evinced by the fact that legislation requiring labeling GMOs have been proposed in more than a dozen states since 2011.   *See http://www.nytimes.com/2012/05/25/science/dispute-over-labeling-of-genetically-modified-food.html?_r=0* (last visited January 15, 2013). In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[8]

35.     Concerns about GMOs fall into three categories: environmental hazards, human health risks and economic concerns.  Concerns for human health risks associated with GMOs include the possibility that introducing a new gene into a plant may create a new allergen, cause an allergic reaction in susceptible individuals or have an unexpected and negative impact on overall human health.

36.     Twenty state legislatures have introduced bills to require mandatory labeling of GE foods.  (IL, AK, CA, NC, IA, MD, NY, OR, RI, WV, VT, TN, HI, CT, MA, MO, NJ, WA, MI, NH).

---

7.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; Pg. 4.  *See also* "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.
8.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

37.     This heightened concern attests to the materiality of the presence of GMOs to the consumers intended to be protected by state and federal laws prohibiting deceptive and misleading advertising, such as calling something natural when it is not.

### Plaintiff's Purchase of Campbell's 100% Natural Soup Products

38.     Plaintiff purchased Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup, all containing GMO corn, from a Publix supermarket in Fort Lauderdale, Florida, during September of 2012.

39.     Prior to his purchase, Plaintiff perceived, read, and relied upon the labels of the soup cans, including the prominent claims that the products are "100% Natural." Plaintiff believed that there were no genetically modified ingredients in the three products because their labels said they were "100% Natural." Plaintiff would not have purchased the Products had he known that they were not 100% natural.

40.     Plaintiff relied upon the advertising containing the misrepresentations and omissions alleged herein, which was prepared and approved by Defendant and its agents and disseminated through its labeling of the Products.

41.     Plaintiff believed the representation on the label that this soup was "100% Natural" and thus the soup did not contain, nor was it made with, any genetically modified ingredients. If Plaintiff had known the soup cans he purchased contained GMOs and thus was not "100% Natural" he would not have purchased them.[9]

---

9.     Plaintiff is not seeking to impose additional labeling requirements that are "in addition to" nor "different than" the FMIA and/or PPIA. That some flavors of Campbell's 100% Natural Soup may be regulated by the FMIA and PPIA has no relevance to whether these flavors are 100% natural in spite of containing genetically modified corn.

42.     The Products are not "100% Natural" because they contain GMOs, and thus Defendant's advertising and labeling is deceptive and likely to mislead reasonable consumers, like the general public, as a result.

43.     Plaintiff purchased the Products because he believed the Products were "100% Natural," based on his reliance upon Campbell's material statement that the Products were "100% Natural" on the front labeling of the Products, and upon Campbell's omission that the Products contain GMOs in advertising explicitly not related to the labeling of the Products.

44.     Plaintiff has been damaged by his purchase of the Products because the labeling and advertising for the Products was and is false and/or misleading under Florida law; therefore, the Products are worth less than what Plaintiff paid for them and/or Plaintiff did not receive what he reasonably intended to receive.

45.     Moreover, Plaintiff paid a premium price for the "100% Natural" products, as they cost approximately twice as much as other, similar Campbell's soup flavors that are not labeled as "all natural" or "100% natural."

46.     Reasonable consumers, such as Plaintiff and members of the Class attach great importance to a natural, or '100%-natural' label when making a purchasing decision, and rely on food manufacturers such as Defendant, to label their product honestly and accurately in accordance with state and federal laws.

### *Briseno v. Conagra Foods, Inc.*

47.     In addition, in *Briseno v. Conagra Foods, Inc.*, the defendant's Wesson Canola Oil label stated the product was "100% natural.   2011 U.S. Dist. LEXIS 154750, *4 (C.D. Cal. Nov. 23, 2011).  The plaintiff contended that contrary to this representation, the defendant used

plants grown from GMOs, and that GMOs are not "100% natural."  ConAgra argued that the plaintiff's claims were preempted.

48.     Like the Plaintiff in this case, Briseno's primary argument was not that ConAgra was required to state whether its products were made from genetically modified plants on its labels, rather, he contended that ConAgra's affirmative decision to label its products "100% Natural" was deceptive and misleading, given that the products were made from genetically modified organisms.  *Id*. at *13-14.

49.     Although the court in *Briseno* acknowledged that requiring an outright labeling of GMO was pre-empted, it nonetheless acknowledged that the claim "100% Natural" could be misleading to a reasonable consumer.  The Court ultimately concluded that a reasonable consumer could have been misled by the labeling, marketing, and advertising at issue in this case and allowed the plaintiff to pursue its claim on these grounds.  *Id*. at *19-21.

50.     Plaintiff's claims in this case mirror those in *Briseno*, wherein Plaintiff only seeks to impose the labeling and advertising requirements set forth by federal law, noted above, but in this case, Plaintiff also seeks to mandate disclosure of bio-engineered or GM corn on its advertising not related to the labeling or packaging, such as print and online advertisements.  As such, Plaintiff's claims should be considered under the reasonable consumer standard described in *Briseno*.

### V. CLASS ACTION ALLEGATIONS COMMON TO ALL COUNTS

51.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs, numbered one (1) through fifty (50), of this Second Amended Class Action Complaint, as if fully set forth herein.

52.      Plaintiff brings this class action pursuant to *Federal Rule of Civil Procedure* 23, and *Florida Rule of Civil Procedure* 1.220, on his own behalf and on behalf of all other persons similarly situated. The Class which Plaintiff seeks to represent is:

> **All Florida persons who have purchased, for personal use, 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and/or 100% Natural Vegetable Medley Soup flavors containing corn, since September 2009.**

Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. Plaintiff reserves the right to amend the Class definition if further information and discovery indicates that the Class definition should be narrowed, expanded or otherwise modified. Plaintiff is informed and believes that Campbell began selling its 100% Natural Soup in September 2009.

53.      This action is maintainable as a class action under Rule 23(a) and (b)(3) of the *Federal Rules of Civil Procedure*.

54.      **Numerosity**: The Class comprises many thousands of persons throughout the State of Florida. The class is so numerous that joinder of all members is impracticable, and the disposition of their claims in a Class Action will benefit the parties and the Court.

55.      **Commonality:**  The questions of law and fact common to the Class have the capacity to generate common answers that will drive resolution of this action. Common questions of law and fact include, but are not limited to, the following:

a) Whether Defendant's practices and representations related to the marketing, labeling and sales of the Products in Florida were unfair, deceptive and/or unlawful in any respect, thereby violating the Florida Deceptive and Unfair Trade Practices Act, *inter alia*, sections 501.201 to 501.213, *Florida Statutes*;

b) Whether Defendant was unjustly enriched as a result of its practices and representations related to the marketing, labeling and sales of the Products in Florida;

c) Whether the Products are "100% Natural";

d) Whether the ingredients contained in the Products are "100% Natural";

e) Whether the claim "100% Natural" on the Products' labels and advertising is material to a reasonable consumer;

f) Whether a reasonable consumer is likely to be deceived by a claim that a product is "100% Natural" where the product contains or is made from genetically modified ingredients; and,

g) Whether Defendant's conduct as set forth above injured consumers and if so, the extent of the injury.

56.    **Typicality:**  Plaintiff's claims, and Defendant's defenses thereto, are typical of the claims of the Class, as the representations made by Defendant are consistent and uniform and are contained in the advertisements and labels that every member of the Class was necessarily exposed to in purchasing Campbell's 100% Natural Soup in the following flavors: Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup.  Thus, there exists a presumption that all Class members relied upon said uniform and consistent advertising and representations to

their detriment. Additionally, all members of the Class have the same or similar injury (loss of purchase price) based on Defendant's false and misleading marketing and advertising.

57. **Adequacy:** Plaintiff does not have any conflicts with any other members of the Class, and will fairly and adequately represent and protect the interests of the members of the Plaintiff Class and any subclass. Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation.

58. **Predominance:** As set forth in detail herein, common issues of fact and law predominate because Plaintiff's FDUTPA and Unjust Enrichment claims are based on a uniform, false and misleading advertising message which all class members were necessarily exposed to: namely, that all flavors or varieties of Campbell's 100% Natural Soup are in fact entirely natural.

59. **Superiority:** A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for Class members to prosecute their claims individually. Absent a class action, Defendant will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class members will continue to suffer losses and Defendant will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains. The trial and litigation of Plaintiff's claims are manageable. Individual litigation of the legal and factual issues raised by Defendant's conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive

supervision by a single court.  The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## VI. FIRST CAUSE OF ACTION:
### VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. §§ 501.201, *ET SEQ.*

60.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs, numbered one (1) through fifty-nine (59), of this Second Amended Class Action Complaint, as if fully set forth herein.

61.     Defendant has violated the Act by engaging in unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Specifically, Defendant has represented that the Products are "100% Natural," when in fact, they are not, because they contain bio-engineered corn, also known as genetically modified corn.

62.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*. The express purpose if the Act is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce" Section 501.202(2).

63.     Plaintiff is a "consumer" as defined by Section 501.203, *Florida Statutes*.

64.     Defendant's Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup (the

"Products," which are misrepresented to be "100% Natural")   are "goods," within the meaning of the Act.

65.     The sale of the Products at issue in this cause was a "consumer transaction" within the scope of the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 501.213, *Florida Statutes*.

66.     Defendant is engaged in trade or commerce within the meaning of the Act.

67.     Plaintiff alleges that Defendant committed unfair business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the deceptive labeling and advertising of the Products is negligible, if any, when weighed against the harm to the general public.

68.     The harmful impact upon members of the general public that purchased and used the Products outweighs any reasons or justifications by Defendant for the deceptive labeling and advertising practices employed to sell the Products that misleadingly claim to be "100% Natural."

69.     Defendant had an improper motive (profit before accurate marketing) in its practices related to the deceptive labeling and advertising of the Products, as set forth above.

70.     The use of such unfair business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing, advertising and labeling of the Products.

71.     Defendant committed a deceptive act or practice by making the labeling and advertising representations set forth in detail above. These deceptive acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

72.     As a purchaser and consumer of Defendant's Products, and as a member of the general public in Florida who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under FDUTPA.

73.     Section 501.204(1), *Florida Statutes* declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

74.     Section 501.204(2), *Florida Statutes* states that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act".  Defendant's unfair and deceptive practices are likely to mislead – and have misled – the consumer acting reasonably under the circumstances and, therefore, violate Section 500.04, Florida Statutes and 21 U.S.C. Section 343.

75.     Defendant has violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Specifically, Defendant has represented that the Products are "100% NATURAL," when in fact, they are not because they contain GMOs in the form of bio-engineered corn.

76.     As alleged hereinabove, Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendant's actions as set forth herein.  Specifically, prior to the filing of this action, Plaintiff purchased Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup for his own personal use.  In so doing, he relied upon the false representations in Defendant's advertising and labeling that the products are

100% natural.  The products were not 100% natural and are useless to Plaintiff, and he would not have purchased these products if he knew they were not 100% natural.

77.     In its marketing and advertising, Defendant makes false and misleading statements regarding the uses and benefits of the Products, namely that they are "100% Natural."   However, the Products are not 100% natural because they contain genetically modified corn, also known as bio-engineered corn.

78.     Defendant is aware that the claims that it makes about the Products are false and misleading.

79.     The misrepresentation by Defendant is material and constitutes an unlawful business practice.

80.     Plaintiff and Class Members have been aggrieved by Defendant's unfair and deceptive practices in that they purchased and consumed Defendant's Products. The  damages suffered by the Plaintiff and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant, as described above.

81.     Pursuant to Section 501.211(1), *Florida Statutes*, Plaintiff and the Class seek a declaratory judgment and court order enjoining the above described wrongful acts and practices of the Defendant and for restitution and disgorgement.

82.     Plaintiff and Florida purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

83.     Plaintiff has suffered injury in fact and has lost money as a result of Defendant's false representations.   Indeed, Plaintiff purchased Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup in reliance on Defendant's false and misleading claims placed on

every label of these products.  Plaintiff would not have purchased these products if he had known about the massive fraud perpetrated by Defendant.

84.     Additionally, pursuant to sections 501.211(2) and 501.2105, *Florida Statutes*, Plaintiff and the Class make claims for damages, attorney's fees and costs.

85.     The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and Florida purchasers of the Products are entitled to interest in an amount according to proof.

### VII. SECOND CAUSE OF ACTION:
### <u>UNJUST ENRICHMENT</u>

86.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs, numbered one (1) through fifty-three (59), of this Second Amended Class Action Complaint, as if fully set forth herein.

87.     Defendant has misleadingly claimed that Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup (the "Products") are "100% Natural," when in fact, they are not because they contain bio-engineered corn, also known as genetically modified corn.

88.     Plaintiff and Class Members conferred a benefit on Defendant by purchasing Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup.

89.     Defendant accepted and retained the benefit in the amount of the profits it earned from sales of its Products to Plaintiff and Class Members.

90.     Defendant has profited from its unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiff and Class Members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

91.     As alleged hereinabove, Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendant's actions as set forth herein.  Specifically, prior to the filing of this action, Plaintiff purchased Campbell's 100% Natural Light Southwestern-Style Vegetable Soup, 100% Natural Tomato Garden Soup, and 100% Natural Vegetable Medley Soup for his own personal use.  In so doing, he relied upon the false representations in Defendant's advertising and labeling that the products are 100% natural.  The products were not 100% natural and are useless to Plaintiff, and he would not have purchased these products if he knew they were not 100% natural.

92.     In its marketing and advertising, Defendant makes false and misleading statements regarding the uses and benefits of the Products, namely that they are "100% Natural."

93.     The Products are not 100% natural because they contain genetically modified/bio-engineered corn.

94.     Defendant is aware that the claims that it makes about the Products are false and misleading.

95.     Plaintiff and Class Members do not have an adequate remedy at law against Defendant (in the alternative to other claims pleaded herein).

96.     Plaintiff and Class Members are entitled to restitution of the excess amount paid for the Products, over and above what they would have paid if the dangers and health risks associated with the Products had been adequately disclosed.   Accordingly, the Products were

valueless such that Plaintiff and Class Members are entitled to restitution in an amount not less than the purchase price of the Products.

97.     Plaintiff and Class Members are also entitled to disgorgement of the profits Defendant derived from the sale of its Products.

## VIII. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, individually, and on behalf of all others similarly situated, prays for relief pursuant to each cause of action set forth in this Second Amended Class Action Complaint, as follows:

1.      For an order certifying that the action may be maintained as a class action, certifying Plaintiff as representative of the Class, and designating his attorneys Class counsel.

2.      For an award of equitable relief as follows:

(a)     Enjoining Defendant from making any claims for the Products found to violate the FDUTPA as set forth above;

(b)     Requiring Defendant to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Second Amended Class Action Complaint; and

(c)     Requiring Defendant to disgorge all ill-gotten gains flowing from the conduct described in this Second Amended Class Action Complaint.

3.      For an award of attorney's fees;

4.      For actual damages in an amount to be determined at trial;

5.      For an award of costs and any other award the Court might deem appropriate;

6.      For pre- and post-judgment interest on any amounts awarded; and

7.      Providing such further relief as may be just and proper.

## IX. JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

**Respectfully Submitted,**

Dated: <u>March 11, 2013</u>          By: <u>/s/  Angela V. Arango-Chaffin</u>
                                   Angela V. Arango-Chaffin, Esq.
                                   FL. Bar No.: 87919
                                   *angela@chaffinlawfirm.com*
                                   **THE FLORIDA CHAFFIN LAW FIRM**
                                   1455 Ocean Drive
                                   Suite 811
                                   Miami, FL 33139
                                   (713) 818-2515
                                   (713) 952-5972 (fax)

                                   Benjamin M. Lopatin, Esq.
                                   Cal. Bar No.: 281730
                                   *lopatin@hwrlawoffice.com*
                                   **THE LAW OFFICES OF
                                   HOWARD W. RUBINSTEIN, P.A.**
                                   One Embarcadero Center, Suite 500
                                   San Francisco, CA 94111
                                   (800) 436-6437
                                   (415) 692-6607 (fax)
                                   (To Apply as Counsel *Pro Hac Vice*)

                                   *Attorneys for Plaintiff Mark Krzykwa
                                   and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this <u>11th day of March, 2013</u>, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

                                   <u>/s/   Angela V. Arango-Chaffin</u>
                                   Angela V. Arango-Chaffin, Esq.